UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MICHAEL DALTON as ADMINISTRATOR OF
THE ESTATE OF AILEEN McKAY-DALTON and
MICHAEL DALTON, Individually,

                    Plaintiffs,

       -against-

UNITED STATES OF AMERICA,

                    Defendant.

-------------------------------------------------------------------X

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**12-CV-506 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Michael Dalton filed suit against Defendant United States of America, pursuant

to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671, et seq., for the alleged

wrongful death of his late wife, Aileen McKay-Dalton. (Compl. (Dkt. 1).) McKay-Dalton died

as a result of injuries she sustained in a July 8, 2010, motor vehicle accident. Plaintiff alleges

that federal agent Joel Loudon Murphy, who was driving the vehicle that collided with McKay-

Dalton's Vespa scooter, was negligent in his operation thereof, causing the accident. (Id.) On

December 15, 2014, through December 18, 2014, the court held the first portion of a bench trial,

limited to the issue of liability. After considering the evidence put forth at trial, and having

reviewed the parties' post-trial briefing on this issue, the court now states the following Findings

of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## I.    FINDINGS OF FACT

      The tragic accident that is the subject of this case occurred at approximately 5:25 p.m., on

July 8, 2010, at the intersection of Clinton Avenue and DeKalb Avenue, in Brooklyn, New York.

---

[1] The United States moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c) at the close of Plaintiff's liability case, and again at the close of Defendant's liability case; the court reserved judgment. The court finds that the case is properly resolved at this time, on consideration of all the evidence adduced to date.

It was summer, the weather was clear, and it was light out. (Bench Trial Tr. ("Tr") at 32-33, 200.)

## A. The Intersection[2]

Clinton Avenue is a two-way, two-lane roadway. Traffic travels both northbound and southbound, divided by a double-yellow line. (Tr. 60, 265.) There are parked cars on both sides of Clinton Avenue. (Tr. 265.) DeKalb Avenue is a one-way street, with traffic travelling westbound only. (Tr. 60, 265.) There are parked cars on both sides of DeKalb Avenue (Tr. 265; Def.'s Ex. S), and a bicycle lane just to the right of the left parking lane (i.e., closer to the south side of the street). (Def.'s Ex. S.)

Vehicular traffic at the intersection of Clinton and DeKalb Avenues is controlled by a three-phase (green/yellow/red) traffic signal light for all traffic going north- and southbound on Clinton as well as westbound on DeKalb. (Tr. 60.) There are also pedestrian lights at the corners of the intersection. (Tr. 265.) The traffic control lights were operating properly at the time of the accident. (Tr. 71, 87.)

There are crosswalks at all four corners of the intersection. (Tr. 60; Def.'s Ex. D; Def.'s Ex. S.) On Clinton, as traffic proceeds from south of the intersection, north towards the intersection, there is a stop line several feet south of the south edge of the south crosswalk. (See Def.'s Ex. D; Def.'s Ex. E.) On DeKalb, as traffic proceeds from east of the intersection, west towards the intersection, there is a stop line several feet east of the east edge of the east crosswalk. (See Def.'s Ex. D; Def.'s Ex. E.) On the east side of Clinton, it is approximately 44 feet from the south side of the intersection to the north side thereof, with "intersection" defined as the inner area between the closest boundaries of the crosswalks. In other words, it is

---

[2] The court made a site visit to the vicinity of the intersection on the morning of December 18, 2014, at approximately 9:40 a.m., in the presence of Plaintiff and counsel for both parties.

approximately 44 feet between the northernmost line of the south crosswalk and the southernmost line of the north crosswalk.  (Tr. 270.)

If a person were standing to the east of the intersection, on DeKalb Avenue, just to the left of a car parked in the right parking lane (i.e., on the driver's side of the car), it would be possible to see the color of the traffic lights that control westbound vehicular traffic on DeKalb. However, from that position, during daylight hours, it would be difficult, if not impossible, to see the color of the traffic lights that control northbound and southbound traffic on Clinton Avenue. The court made this observation during its December 18, 2014, site visit to the vicinity of the intersection.  <u>See</u> <u>supra</u> note 2.  (<u>See also</u> Tr. 291-92.)  On a summer afternoon at approximately 5:25 p.m., looking from the northeast to southwest, into the sun, this certainly would be impossible.

## B.     The Collision

On July 8, 2010, near the time of the accident, Special Agent Joel Loudon Murphy was operating a black Ford Explorer (the "SUV") near the intersection.  He was driving northbound on Clinton Avenue, toward the intersection.[3]  Decedent Aileen McKay-Dalton was operating a powder blue Vespa scooter near the intersection.  She was driving westbound on DeKalb Avenue, toward the intersection.  The accident occurred when McKay-Dalton and Murphy both entered the intersection—McKay-Dalton, coming from the east, and Murphy, coming from the south—and collided in the east half of the intersection.  (<u>See</u> Tr. 194, 270.)

There is a dispute between the Government's expert and Plaintiff's expert with respect to the north/south position of the vehicles' point of impact.  The Government's expert, Dr. Matthew

---

[3] Murphy is a Special Agent for the Department of Treasury, Internal Revenue Service.  It is undisputed that Murphy was, at the time of the accident, a federal employee acting in the course of employment with the United States of America, and that the vehicle involved in the accident was owned by the United States of America.  (Joint Pretrial Order (Dkt. 63) ¶ 7(b), at 4; Compl. ¶¶ 22-23; Answer (Dkt. 6) ¶¶ 22-23.)

Kaplan, testified that the point of impact occurred approximately halfway between the interior north/south boundaries of the crosswalks. (Tr. 270.) Plaintiff's expert, William FitzPatrick, contended that the point of impact occurred approximately 10 feet to the south of where Dr. Kaplan had placed it. (Tr. 464-65.) The court credits Dr. Kaplan's testimony over that of Mr. FitzPatrick for several reasons, including testimony by eyewitness Camila Crazut that the collision occurred in front of her, in the northeast quadrant of the intersection (see Tr. 193-94); testimony by two credible eyewitnesses that the Vespa, when stopped at the DeKalb Avenue traffic light, was closer to the north side of the street than the south side (see Tr. 132-33 (Elesh), 216 (Stephens)); and the court's determination, discussed at length below, that Dr. Kaplan's expert opinions are more reliable than those of Mr. FitzPatrick.[4] See infra Part I.F.1.

The front of McKay-Dalton's Vespa collided with the front passenger side of Murphy's SUV, forward of the SUV's passenger doors, on the right side of the frame.[5] (Tr. 64, 84, 85-87; Pl.'s Ex. F at 256, 259; see also Pl.'s Ex. S at DALTON_USA_000028 (noting damage to the Vespa's front axle).) McKay-Dalton was thrown off of the Vespa. (Tr. 193, 208, 212.) She hit the windshield of the SUV (Pl.'s Ex. F at 256; Pl.'s Ex. S at DALTON_USA_000028; Tr. 64), and she flew north on Clinton, where she landed on the roadway, on the north side of the intersection. (Tr. 208, 212.) The Vespa also came to rest on Clinton Avenue, north of the northern crosswalk by less than one car's length. (Tr. 65-66, 101-03; Pl.'s Ex. F at 247, 251.) McKay-Dalton likely landed approximately one car length's north of the Vespa. (Tr. 104; Pl.'s Ex. F at 247.) The SUV also came to rest on the north side of the intersection (Pl.'s Ex. C),

---

[4] However, the court's other Findings of Fact and the Conclusions of Law set forth below likely would not be affected even if the court were to credit Mr. FitzPatrick's opinion as to point of impact. FitzPatrick acknowledged that incorporating his point of impact into Dr. Kaplan's calculations would not affect the conclusion as to the color of McKay-Dalton's traffic light at the time she entered the intersection. (Tr. 479-80.)

[5] Eyewitness Camila Crazut testified that the Vespa collided with the SUV between the two passenger-side doors. (Tr. 193.) However, in light of photographs of the damage to the vehicles (Pl.'s Ex. F at 256, 269), the court here credits Detective Daniel Ryan's testimony that the bulk of damage was located forward of both passenger doors.

although it is unclear precisely where the SUV came to rest, as it was moved to facilitate emergency vehicles. (Tr. 66-67.) McKay-Dalton died as a result of the injuries she sustained in the accident. (Joint Pretrial Order (Dkt. 63) ¶ 7(d), at 4.)

C.    **Sequencing of Traffic and Pedestrian Signals**

The vehicular traffic lights at the intersection at issue operate on a 60-second cycle. Starting at zero, the traffic light for Clinton Avenue turns green, and it remains green for 19 seconds. It is then yellow for 3 seconds, and, finally, red for 38 seconds (for a total of 60 seconds). (Tr. 274-75; Def.'s Ex. U; Def.'s Ex. Y.) The corresponding traffic light for DeKalb Avenue is red for the 19 seconds that the light on Clinton is green. DeKalb remains red for the 3 seconds of Clinton's yellow and for an additional 2 seconds after the Clinton light turns red. In other words, the vehicular traffic lights are red in all directions—called an "all red"—for 2 seconds of the cycle. (Tr. 274-75; Def.'s Ex. U; Def.'s Ex. Y.) Then, at second 24 in the cycle, the traffic light on DeKalb turns to green.[6] Accordingly, once the traffic light for northbound vehicular traffic on Clinton turns yellow, there is a period of 5 seconds before the traffic light for westbound vehicular traffic on DeKalb turns green. (Tr. 274-75; Def.'s Ex. U; Def.'s Ex. Y.)

The pedestrian lights are coordinated with the traffic lights. They also operate on a 60-second cycle; however, their phases occur at different points within that cycle. (Tr. 277; Def.'s Ex. V; Def.'s Ex. Y.) Pedestrians on Clinton Avenue, crossing DeKalb, receive a solid white signal (a white person) at the same time the vehicular traffic light for Clinton turns green. The pedestrian light remains a white person for the first 7 seconds of the green traffic light. Then, for the next 12 seconds, while the vehicular traffic light remains green, the pedestrian signal turns to and remains a blinking red hand. (Tr. 277; Def.'s Ex. V; Def.'s Ex. Y.) At second 19, at the

_____
[6] The traffic light on DeKalb Avenue remains green for 31 seconds. It then turns yellow for 3 seconds. Finally, the DeKalb traffic light is red for 2 seconds of "all red" and then remains red throughout the entire Clinton Avenue green, yellow, and "all red" cycle. (Def.'s Ex. U; Def.'s Ex. Y.)

same time the vehicular traffic light turns yellow, the pedestrian light changes from a blinking red hand to a solid red hand. The pedestrian light remains a solid red hand for the 3 seconds of the yellow traffic light and then throughout the entire red traffic light. (Tr. 277; Def.'s Ex. V; Def.'s Ex. Y.) This means that the Clinton Avenue pedestrian signal becomes and remains a solid red hand for a total of 5 seconds before the traffic light for westbound vehicular traffic on DeKalb Avenue turns green. (Tr. 277; Def.'s Ex. V; Def.'s Ex. Y.)

### D.  Joel Loudon Murphy

#### 1.  Background

Special Agent Murphy chose to go into government service after working for some period of time at PricewaterhouseCoopers LLP. (See Tr. 11.) When first accepted into government service, he spent "approximately more than a half year" at a training academy in Georgia, preparing for work as a criminal investigator. (Tr. 11.) The training was all-inclusive and fairly extensive. (Tr. 11.) He learned at the training academy that when performing investigative work, one must be aware of one's surroundings, observe what is going on, and make decisions and take actions based on those surroundings and observations. (Tr. 11-12.)

After graduating from the training academy in February 2009, Murphy was assigned to a unit in Staten Island, New York. (Tr. 12.) Around February 2010, after approximately one year with the Staten Island unit, Murphy was transferred to the El Dorado Task Force, dealing with drug enforcement. (Tr. 12-13.) At the time of the accident, Murphy had been working for the El Dorado Task Force for approximately 6 months. (Tr. 13.)

#### 2.  Activities Earlier That Day

On the date of the accident, Murphy had been participating in a surveillance operation in the Fort Greene/Prospect Park area of Brooklyn, New York. (Tr. 13, 17.) He had not been

actively conducting surveillance; instead, the task force was waiting for a target to enter the area. If the target did appear, the task force was planning to pick up surveillance on the target. (Tr. 18.)  Murphy had previously conducted surveillance in Brooklyn, but he had not done much in the area near the site of the accident.  He did not recall having previously been on either Clinton or DeKalb Avenues.  (Tr. 19.)

Murphy testified that he had only a "general memory" of the surveillance operation. (Tr. 13.)  He did not recall what time he had left his home that day, or what time he had begun work.  (Tr. 17.)  He did not recall when or where he had last eaten prior to the accident.  (Tr. 18.) Murphy's first clear memory of the day was heading northbound on Clinton Avenue at approximately 5:00 p.m.  (Tr. 13, 18, 23.)  He did not recall where he first turned onto Clinton Avenue.  (Tr. 19.)  He did not recall to which intersecting street he was heading at that time. (Tr. 23.)

        3.    <u>Items in Vehicle</u>

        *a.*    *GPS Device*

At the time of the accident, Murphy had in his possession a GPS direction-assistance device, either a Garmin brand or a similar item.  (Tr. 20, 42.)  The unit was standard, one that a private citizen could purchase, although it was Government-issued.  (Tr. 47.)  The device was not mounted on the dashboard or windshield as a permanent GPS device in the car.  (Tr. 20, 42-43.)  Murphy testified that he typically would set the GPS unit on the dashboard or in the console of the car, and that it was not his practice to hold the GPS unit in his hands while driving. (Tr. 20, 42-43, 47.)  He also testified that he did not specifically recall where the GPS unit was located on the date of and at the time of the accident.  (Tr. 20, 50.)

At one point during his surveillance operation, Murphy wanted to take a break, and to use the restroom, and he typed "bookstore" or a similar term into his GPS unit. (Tr. 20, 44, 47-48.) The unit listed a Barnes & Noble, and he selected that as his destination. (Tr. 47-48.) Murphy testified that he was not in a hurry to get to the Barnes & Noble, or to use the restroom, and that if it had been urgent to get to a restroom, he would not have gone to the Barnes & Noble. (Tr. 48.)

Murphy was following audio directions from the GPS unit, heading towards the Barnes & Noble, when the accident occurred. (Tr. 47-48.) He testified that he did not recall precisely whether it was a man's or a woman's voice, as he had not used the unit since the accident. He thought it had been a woman's voice. (Tr. 48.)

### b. Cellular Telephones

Murphy also had in his possession at the time of the accident two cellular telephones: one personal and one Government-issued. (Tr. 21.) No calls were made or received on Murphy's Government cellphone around the time of the accident. (Tr. 78-79.) Murphy's personal cellphone records indicate that he used his personal cellphone to make two outgoing calls shortly after 5:00 p.m. (at 5:04 p.m. and 5:06 p.m., respectively). Both were connected for approximately 22 seconds; neither went into the recipient's voice mailbox. (Tr. 14, 390-91; Pl.'s Ex. AA-1.)

Murphy's cellphone records also indicate that he received a call on his personal cellphone immediately prior to the accident, at 5:24 p.m. However, this call was not answered; instead, it went into Murphy's voice mailbox. (Tr. 384-85, 391-92; Pl.'s Ex. AA at 1, 4; Pl.'s Ex. AA-1.) Consistent with these records, Murphy testified that he did not recall receiving a call at this

time.[7]  (Tr. 14, 16-17.)  As the phone records show that this call was not answered and instead went to voicemail, the court finds that Murphy was not distracted by the 5:24 p.m. phone call at the time of the collision.

When Murphy met with New York City Police Department ("NYPD") Detective Daniel Ryan, five days after the accident, Detective Ryan asked Murphy for his cellphone number. Murphy provided his business cellphone number, not his personal number.  (Tr. 78-79.)

> c.    *Radios*

Murphy further had two Government-issued radios in his vehicle: a handheld and a vehicle unit.  (Tr. 20-21.)

> 4.    Actions Post-Accident

After the collision, Murphy went to McKay-Dalton to render aid.  (Tr. 36-37, 129-30, 212.)  Later, Murphy spoke to a police officer or officers at the scene.  (Tr. 36-37.)  Murphy may have initially spoken to Officer Anthony Manatrizio, who was working in the relevant precinct at the time of the accident, and who responded to the scene.[8]  (Tr. 107-09.)

At some point, Murphy called his supervisor, Lawrence Carlucci, but did not speak with him; he left a voicemail for Carlucci.  (Tr. 38.)  Eventually, Murphy spoke with a different agent,

---

[7] Murphy testified that he did not recall making or receiving any phone calls, hearing the phone ring, sending or receiving any texts, or using his cellphone for any purpose while he was heading toward the Barnes & Noble. (Tr. 47.)

[8] Officer Manatrizio testified that he recalls having spoken briefly with Murphy.  Manatrizio got the impression from Murphy that Murphy had been responding to an emergency, although he did not recall Murphy actually using the word "emergency."  (Tr. 109, 111.)  The court does not credit the suggestion that Murphy initially stated to Officer Manatrizio that he had been responding to an emergency.  Before Manatrizio took the witness stand, Plaintiff's counsel informed Manatrizio that he had mentioned an "emergency" at his deposition (Tr. 110-11), and it is unclear whether Manatrizio ever spoke with Murphy at all.  (See Tr. 109, 111 (nothing in his notes about the conversation having occurred); Tr. 111-12 (unclear whether Manatrizio had independent recollection of speaking with Murphy at all).)  Murphy testified that he did not recall telling a responding officer that he was responding to an emergency; he did not know why he would have said that, because there was no emergency.  (Tr. 37, 48-49.) Additionally, Detective Ryan testified that he was not aware of any police officer having reported that Murphy stated he was responding to an emergency (Tr. 92-93), although Manatrizio stated that if Murphy had told him something about where he had been heading at the time of the accident, he would have reported it to the investigating detective.  (Tr. 113.)

Rene Tirado. (Tr. 38.) Tirado received several phone calls from Murphy after the accident. (Tr. 53.) In the first phone call, Murphy advised Tirado that he had been in a traffic accident. (Tr. 54.) Tirado told Murphy to file a police report and to advise Carlucci, their supervisor. (Tr. 54-55.) Tirado did not inquire as to the seriousness of the accident, but in a subsequent phone call, Murphy informed Tirado that it was "serious." (Tr. 55.) Tirado does not recall having ever told Murphy not to speak to the police. (Tr. 54.) At some point, Tirado made a phone call or calls to an attorney or attorneys regarding the incident. (Tr. 54.) After speaking with Tirado, Murphy told the police that he was not feeling well, and he asked to be taken to the hospital. (Tr. 38-39.) Murphy testified that he did not refuse to speak to the police or tell them that he wanted a lawyer. (Tr. 39.)

Detective Daniel Ryan,[9] the NYPD detective from the Highway Patrol Collision Investigation Squad assigned to investigate the collision, arrived on the scene an hour or two after the accident, or possibly even later. (Tr. 57-60, 61-62, 82.) When Ryan arrived at the scene, Murphy was seated, alone, in the rear of one of the Highway Patrol vehicles. (Tr. 63, 82-83.) Murphy was there voluntarily. It was a very hot day, and Murphy could not be let back into his SUV to get out of the sun. (Tr. 82-83.) Ryan attempted to get some information from Murphy but was told that Murphy was going to be transported to the hospital for trauma. (Tr. 63) When Ryan approached him, Murphy told Ryan that he did not feel well. (Tr. 83-84.) Eventually, Murphy did leave the scene and he went to the hospital. (Tr. 83-84.)

Five days after the incident, Murphy and his attorney met with Detective Ryan in Ryan's office. (Tr. 74; Pl.'s Ex. I at 368; Pl.'s Ex. S at DALTON_USA_000027.) Ryan took Murphy's witness statement, which was consistent with Murphy's trial testimony. (See Pl.'s Ex. S at

---

[9] The court notes that Detective Ryan's credibility has been placed in question. Detective Ryan has shown himself not to be a disinterested witness. Rather, Detective Ryan has shown interest in favor of the Plaintiff. (See Tr. 331-37, 340 (discussing Detective Ryan's attempt to procure Hector Maldonado's appearance at trial as an eyewitness).)

DALTON _USA_000027.)  Murphy cooperated with the investigation to the extent that he was

asked to do so, and he never refused to cooperate in any way.  (Tr. 49.)

Murphy has not been back to the scene since the accident.  (Tr. 34-35.)

**E.    Aileen McKay-Dalton**

1.    Background

McKay-Dalton grew up in Scotland.  (Tr. 220.)  She moved to New York with Plaintiff

Michael Dalton in 1994.  (Tr. 221.)  They lived in Tokyo from 2000 to 2003, and then moved

back to New York in 2003.  (Tr. 221.)  Michael Dalton testified that when they lived in Tokyo,

McKay-Dalton had driven a Vespa almost every day for two-and-a-half years.  (Tr. 221-22.)  She

was 40 years old at the time of her death.  (Pl.'s Ex. M at 611.)

2.    Location Prior to Accident

Just prior to the accident, McKay-Dalton and the Vespa were stopped at the westbound

traffic light at DeKalb Avenue.  (Tr. 132-33, 210-11, 215.)  The Vespa was the first vehicle at

the traffic light, located between the stop line and the crosswalk.  (Tr. 132-33, 215.)  It was

closer to the right (north) side of DeKalb than to the left (south) side.  (Tr. 132-33.)[10]

3.    Helmet

There is conflicting evidence regarding whether McKay-Dalton was wearing a helmet, or

was wearing it properly, at the time of the accident.

Three eyewitnesses stated that they saw McKay-Dalton wearing some type of helmet.

Kester Stephens noticed McKay-Dalton prior to the accident, while she was stopped at the

---

[10] The court credits the testimony of eyewitnesses Kester Stephens and Benjamin Elesh with respect to McKay-Dalton's pre-collision location.  Eyewitness Camila Crazut and Agent Murphy did not see McKay-Dalton prior to impact (Tr. 23-24, 26, 192; Pl.'s Ex. I at 360), and the court gives no consideration to the testimony of noncredible witness M.H. Lorraine Dawodu.  See infra Part I.F.5.

DeKalb traffic light.  (Tr. 210-11, 215.)  He testified that McKay-Dalton was wearing a half-face helmet, not a full-face helmet.  (Tr. 211.)

Benjamin Elesh also testified that he first saw McKay-Dalton's Vespa prior to impact, while McKay-Dalton was stopped on DeKalb Avenue, facing west toward the intersection. (Tr. 132-33.)  Subsequently, Elesh was walking north on Clinton Avenue, approximately 15 feet from the northwest corner of the intersection, when the sound of the impact caught his attention. Post-impact, he saw McKay-Dalton in the air, dialed 911, and ran toward her.  (Tr. 128.)  Elesh testified that he saw McKay-Dalton, post-impact, wearing a cream- or light-colored helmet with a chin strap.  (Tr. 128-29.)  He testified that the helmet was still on at that point, but it looked like it was not sitting properly on her head.  (Tr. 128, 135.)

Camila Crazut did not notice McKay-Dalton prior to the impact.  (Tr. 192; Pl.'s Ex. I at 360.)  Crazut did observe the collision itself—it occurred directly in front of her—and the aftermath, and she testified that McKay-Dalton was wearing what she recalled to be a white helmet.  (Tr. 195.)

However, the Government's expert witness, Melissa Pasquale-Styles, M.D., who performed an autopsy on McKay-Dalton, testified that in her opinion, McKay-Dalton's injuries were inconsistent with the Decedent having worn a helmet.[11]  (Def.'s Ex. I at 58:24-59:1.)  This opinion was based on the location of a large laceration on the Decedent's scalp, a large abrasion around the laceration, and the extent of the Decedent's skull fractures.  (Id. at 30:9-15, 58:24-59:1, 59:5-13, 61:12-20.)  Dr. Pasquale-Styles stated that if McKay-Dalton had been wearing a helmet, it had "no protective effect whatsoever" (id. at 39:16-18; see also id. at 61:12-20), and

---

[11] The parties stipulated to the use of the deposition testimony of Dr. Pasquale-Styles in lieu of her live testimony at trial.  (Dec. 8, 2014, Min. Entry; see Joint Pretrial Order ¶ 8(D)(c), at 10; Def.'s Ex. I (Tr. of Dep. of Dr. Melissa Pasquale-Styles).)

that although it would depend on the type of helmet, "most or all" helmets that she had seen "would have covered" the area of the laceration.  (Id. at 63:2-64:6.)  Dr. Pasquale-Styles did note that it was possible that a helmet could have been dislodged if McKay-Dalton were to have "mounted" the SUV and hit her head on the windshield, before being propelled forward.  (Id. at 60:24-61:23.)  Additionally, no helmet was ever returned to Plaintiff Michael Dalton, though he did receive other of McKay-Dalton's effects.  (Tr. 229.)

The court is persuaded that McKay-Dalton was indeed wearing some form of helmet, as three eyewitnesses provided relatively consistent testimony to this effect.[12]  In light of the eyewitness testimony, as well as that of Dr. Pasquale-Styles, the court finds it most likely that McKay-Dalton was wearing a half-face helmet with a chin strap at the time of the accident, that it was not entirely secure, and that it was somewhat dislodged when she made contact with the windshield of Murphy's SUV.

### 4.   iPhone

McKay-Dalton had an iPhone 4 in her possession at the time of the accident.  (Tr. 225, 229, 234.)  Approximately two minutes before the accident, at 5:23 p.m., McKay-Dalton received a phone call originating from Plaintiff Michael Dalton's cellphone.  (Tr. 239-40, 373-77, 381; Pl.'s Ex. Z-1.)  The two phone numbers connected for less than a second.  (Tr. 373-77, 381; Pl.'s Ex. Z-1.)  The call did not transfer to voicemail.  (Tr. 373-77, 381; Pl.'s Ex. Z-1.)  For that to occur—for the phone numbers to connect, and the call not to transfer to voicemail— McKay-Dalton had to have done something to accept the call.  She must have interacted with the phone in some way with respect to that phone call, such as pressing the "answer" button.

---

[12] Additionally, a 911 call report indicates "[h]elmet removed (no damage to helmet)."  (Pl.'s Ex. M at 620.)  But without more, the court does not know what to make of this indication, as it is unknown who made this statement or what its basis was.

(Tr. 376-79, 387.)  This does not mean that any conversation took place, but there was a connection.  (Tr. 387.)

At the time of the accident, McKay-Dalton's iPhone was also undergoing a data upload and download.  Cellphone records indicate that between 4:24 p.m. and approximately 5:39 p.m., her iPhone uploaded 99,630 bytes and downloaded 984,846 bytes of data.  (Tr. 381-83; Pl.'s Ex. Z-2.)  It is not possible from a review of the cellphone records to know what type of data was being sent and received in that transfer, or what application was interacting over AT&T's cellular lines in connection therewith.  (Tr. 383.)

A forensic examination of McKay-Dalton's iPhone could have revealed a substantial amount of additional information.  (See Tr. 349-70.)  The iPhone was still in working condition after the accident.  (Tr. 235.)  However, the Government was not able to conduct a forensic examination of the iPhone, because Plaintiff Michael Dalton disposed of the iPhone during the summer of 2011.  (See Tr. 226-27; Joint Pretrial Order ¶ 7(f), at 4.)

> a.      *Utility of a Forensic Examination*

The Government's expert in digital media forensics, Keith Thomas, testified as to what information could or would have been obtainable from a forensic examination of McKay-Dalton's iPhone, had the phone itself been available for examination.  (Tr. 342, 347.)  The court finds Mr. Thomas's testimony highly credible and relies upon this testimony.

A forensic examination of McKay-Dalton's iPhone would have revealed, inter alia, incoming, outgoing, and missed telephone calls; active and deleted text messages, including the date and time received or sent; and date and time stamps of any applications started and stopped, including playing music on iTunes or instant messaging.  (Tr. 349-50.)  If the iPhone had been switched on, and depending upon whether any active applications or the iPhone itself were using

GPS around the time of the accident, a forensic examination may have revealed GPS information. (Tr. 367-68.)

Thomas could have used this information to build a timeline of events occurring at the times the phone was in use on the date of the accident, and make a determination as to what McKay-Dalton was doing at a particular time with the device. (Tr. 361-62.) Thomas could have determined the accuracy of any GPS data on the phone by conducting testing with the device itself and a separate GPS device. (Tr. 367-68.)

There is no reliable substitute for a forensic examination of the iPhone itself—not a back-up of the iPhone, and not an examination of cellphone records. (Tr. 351-53.) Neither of these would contain all of the information that a forensic examination would contain. (Tr. 368-70.) For example, a back-up contains nothing that had been deleted from the iPhone.[13] (Tr. 351.) Cellphone records would include incoming and outgoing, and perhaps missed, telephone calls, with a date and time stamp. They would also record SMS or MMS text messages as part of the data plan.[14] (Tr. 352.) However, cellphone records by cellphone providers would not contain any deleted contents or GPS information. (Tr. 352-53.) Additionally, if an iPhone user were in the process of typing a text message, but never actually sent the message, a forensic examination of the iPhone would reveal this information, as well as the date and time. Cellphone records would not contain this information. (Tr. 353.)

Moreover, if McKay-Dalton's iPhone had used the operating system "iOS 5" and had used the "iMessage" application, she would have been able to send and receive messages

---

[13] A back-up of McKay-Dalton's iPhone was not available for review in this case. Thomas testified that he was provided with a CD that allegedly contained a back-up of McKay-Dalton's iPhone, but he knew immediately upon viewing the contents of that CD that it did not contain a true back-up file. It contained significantly less data than would be included on such a back-up. (Tr. 349, 356-57; see also Tr. 237, 239.)

[14] Accordingly, McKay-Dalton's cellphone records did contain time and date of phone calls sent and received, time and date of text messages sent and received, and time and date of bytes (data used) uploaded and downloaded. (Tr. 362-63.)

through that application with anyone else using an iOS device (an iPad, iPod, or iPhone), and all of the data would be sent through the application; accordingly, none of that data would be retrievable through anything other than a forensic examination of the iPhone itself. (Tr. 351.)

*b.*     *Disposition of McKay-Dalton's iPhone*

McKay-Dalton's iPhone was returned to Plaintiff Michael Dalton after the accident. (Tr. 229-35.) It was in working condition. (Tr. 235.) He looked at the contents of the iPhone when it was returned to him. (Tr. 235.) However, he subsequently disposed of the iPhone, such that it was not available for inspection by the Government. Accordingly, the Government questioned Plaintiff Michael Dalton at length regarding the disposition of McKay-Dalton's iPhone.

Michael Dalton testified that after the accident, he had at first taken McKay-Dalton's handset and used that as his own, because it was a better model than the one he had. (Tr. 225.) But a year later, he moved to the United Kingdom. (Tr. 226.) The AT&T phone plan that applied to the iPhone was not compatible with the system in the United Kingdom, and Dalton testified that he could not make use of the phone there without incurring large usage charges, so he purchased another phone in the United Kingdom. (Tr. 226.) Dalton also testified that he did not know when he was going to return to the United States, if at all.[15] (Tr. 236.)

Then, in the summer of 2011, Dalton and his children were staying at the home of a friend of his and McKay-Dalton's, David Swannell, who lived in Sri Lanka. (Tr. 226-27, 236.) Dalton testified that Swannell told Dalton that that model iPhone was not available for purchase in Sri Lanka, and that Swannell could unlock the phone and use it himself. (Tr. 226-27.) In the summer of 2011, Dalton gave the phone to Swannell, and Dalton has not seen it since. (Tr. 227.) Michael Dalton understood when he gave the phone to Swannell that unlocking the phone involved wiping or eliminating all data from the phone. (Tr. 235-36.)

---

[15] Plaintiff Michael Dalton, like McKay-Dalton, is originally from Scotland. (Tr. 219-21.)

Later, in 2013, Michael Dalton purchased for his daughter Lottie the same model iPhone that he gave to Swannell, at a cost of approximately $100-$200. (Tr. 235-36.)

Soon after the accident, Dalton had a meeting with Detective Daniel Ryan and some other individuals, including a man named Jim Waldon, who had been recommended to Dalton by a friend. (Tr. 230.) Waldon had been recommended because he was a former prosecutor and he knew the "inner workings of investigations and prosecutions." (Tr. 231-32.) Waldon suggested different ways that the NYPD could investigate the accident, including asking if the Assistant District Attorney had obtained Murphy's telephone records. (Tr. 232.)

Dalton later sent a follow-up email, dated September 17, 2010, to Detective Ryan, in which he asked whether Ryan had obtained Murphy's phone records. (Tr. 232-34; Def.'s Ex. B.) He thought it would be "important information to help the police determine what happened." (Tr. 234; see also Pl.'s Ex. I at 352 (subpoena to retrieve Murphy's cellphone records "at request of the victim's family").)

In April 2013, as part of this lawsuit, Dalton was asked questions under oath about what happened to the iPhone, and he said he did not recall. (Tr. 235.) At trial, Dalton testified that he did not, at the time, recall what had become of the phone. But months later, he remembered he had given it to Swannell. (Tr. 235.)

Dalton's trial testimony included somewhat conflicting explanations regarding why he gave the phone to Swannell. Several times, Dalton stated that he had no use for the phone; it was a "hundred dollar piece of inert equipment" as far as he was concerned. He affirmed that he did not hold on to it until later to give to his daughter as a keepsake because it held no sentimental value. (Tr. 226-27, 236, 238-39.) However, at the same time, Dalton testified that the phone was something connected to his late wife that he could give to Swannell, a very old, dear friend

who was upset about McKay-Dalton's death. He stated that the iPhone was something with a personal connection; it was akin to giving away his wife's clothing. (Tr. 236, 238-39.)

Ultimately, the court is extremely skeptical of the events surrounding the disposal of McKay-Dalton's iPhone. The court concludes that Plaintiff Michael Dalton was aware that important information could be located on McKay-Dalton's phone. Dalton is a highly-educated individual. (Tr. 219-20 (degrees in physics, math, and environmental science; employed as bond options trader).) He was involved in the police investigation of the accident and specifically showed interest in Agent Murphy's own cellphone records. He looked at the contents of McKay-Dalton's iPhone and had every opportunity to determine whether it would be in his best interest to make those contents available or not available to the opposing party in this lawsuit. And the conflicting explanations regarding why he gave the phone to Mr. Swannell—alternatively, that the phone was a meaningful keepsake and that the phone held no sentimental value—are highly suspect. Additionally, the cellphone record data, discussed above, indicates that (1) McKay-Dalton interacted with her phone at 5:23 p.m., in response to a phone call placed by Michael Dalton, and (2) a significant amount of data was being used during the time period at issue.

### 5. Headphones

Agent Murphy testified that he did not remember seeing any headphones when he went to render aid to McKay-Dalton, after the accident. (Tr. 36-37.) Benjamin Elesh, who also went to McKay-Dalton to attempt to provide aid, did not see any headphones or earbuds in her ears. (Tr. 133.) The Government introduced no evidence to the contrary.

Accordingly, the court concludes that McKay-Dalton was not using or wearing headphones or earbuds at the time of impact. No evidence was introduced by either party

regarding whether McKay-Dalton had headphones or earbuds in her possession, so the court can make no conclusions as to the Decedent's use thereof prior to the time she began to move the Vespa into the intersection from its previously stopped position, facing westbound on DeKalb Avenue.

6.    Drugs in McKay-Dalton's System

McKay-Dalton's autopsy indicated that she had two drugs in her system: diphenhydramine and nordiphenhydramine.  (Tr. 99; Pl.'s Ex. I at 385; Pl.'s Ex. M at 654.) Diphenhydramine is commonly known as Benadryl; nordiphenhydramine is its breakdown product.  (Def.'s Ex. I at 37, 46.)  The main side effect of diphenhydramine is drowsiness, and it can potentially affect an individual's ability to drive.  (Def.'s Ex. I at 48-49.)  Although Detective Ryan had assumed that these drugs were administered after the collision (see Tr. 100), Dr. Pasquale-Styles's deposition testimony suggested that the diphenhydramine would likely have been something taken by McKay-Dalton prior to the accident.  (See Def.'s Ex. I at 37-43.) However, no evidence was introduced to allow the court to determine whether the amount of diphenhydramine in McKay-Dalton's system would have caused her to experience the side effect of drowsiness at the time of the collision.  (See Def.'s Ex. I at 37-50.)

**F.    Color of the Traffic Lights**

The primary dispute in this case is whether Murphy or McKay-Dalton had the right- of-way at the time each entered the intersection.  Both parties' experts agree that with Murphy traveling at a speed of 25-30 miles per hour, it is not possible that Murphy entered at any time on a yellow light and McKay-Dalton waited for a green light to begin moving; the accident would not have occurred under these circumstances.[16]  (Tr. 294-95, 466-67, 470-71, 483.)  Therefore,

---

[16] The same holds true in the event that Murphy was traveling at a faster speed, as he would have gone through the intersection even more quickly, although no evidence was introduced to suggest that he was doing so.

one of them must have entered the intersection against a red light.  To determine the color of the traffic lights at the time that both vehicles entered the intersection, the court must consider the testimony of Agent Murphy and the eyewitnesses Kester Stephens and Camila Crazut,[17] in connection with the evidence of the timing of the traffic and pedestrian lights, and as assisted by the testimony of the parties' accident reconstruction expert witnesses.

### 1.    Discussion of Expert Testimony

As a general matter, and to the extent that it conflicts with the testimony of the Plaintiff's rebuttal expert, William FitzPatrick, the court credits the testimony of the Government's expert, Matthew Kaplan, Ph.D.  Dr. Kaplan's review was thorough.  He reviewed deposition transcripts, transcripts of DMV hearings, police reports, and photographs of the scene; he conducted a physical inspection of the Vespa; he visited the scene three times; he took measurements of the intersection, including the lengths of the crosswalks, the distance from the intersection of Clinton and Lafayette Avenues to the intersection of Clinton and DeKalb Avenues,[18] the distances from crosswalks to stop lines, and stop lines to intersections; he took photographs; he performed a 3D laser scan of the intersection and surrounding area;[19] he tested Vespa acceleration; and he looked at the light signal timing.  (Tr. 263-64.)

Dr. Kaplan performed Vespa acceleration testing to determine the time it would take for the Vespa to get from the place where it had been stopped (at the crosswalk or stop line) into the

---

[17] Eyewitness Benjamin Elesh's testimony does not bear directly on this issue.  As discussed at length below, see infra Part I.F.5, the court finds eyewitness M.H. Lorraine Dawodu entirely incredible and gives no consideration to any of her testimony.

[18] Lafayette Avenue is directly south of and runs parallel to DeKalb Avenue.  It is approximately 495 feet from the intersection of Lafayette and Clinton Avenues to the intersection of DeKalb and Clinton Avenues.  (Tr. 266.)

[19] 3D laser scanning reconstructs an area in 3D geometry on a computer, by taking slices of the geometry and recording millions of points that are then reassembled on a computer to recreate the three-dimensional geometry. (Tr. 264.)

intersection.  (Tr. 266.)  He did this by fitting a Vespa of the same model year and same model engine size as that driven by McKay-Dalton with instrumentation to measure time, distance, velocity, and acceleration, and having a rider of approximately the same weight as McKay-Dalton accelerate at various levels: light, normal, and heavy.  (Tr. 266-67.)  Light was somewhat unstable; normal was measured; and heavy was at or close to full throttle.  (Tr. 267.)  He recorded the data over 60 feet, because that was beyond what was needed for the distances McKay-Dalton would have traveled from her stopped position at the traffic light to the point of impact (the distance from the stop line at DeKalb to the point of impact is under 60 feet, as is the distance from the crosswalk at DeKalb to the point of impact).  (Tr. 267.)

Dr. Kaplan used photogrammetry (a way to convert photographs into quantified distances and measurements) and the police photographs of gouge marks in the intersection to determine the point of impact.  (Tr. 268.)  Dr. Kaplan testified that he was able to determine both where the impact occurred and the orientation of the vehicles upon impact.  (Tr. 268.)

Plaintiff's rebuttal expert, William FitzPatrick, P.E., P.T.O.E., performed his initial reconstruction work without ever visiting the site.  (Tr. 463-64.)  Instead, he consulted Dr. Kaplan's report; minutes of a DMV hearing; police documents including witness statements; deposition transcripts; photographs of the scene; and Google Earth imagery of the intersection. (Tr. 402-03.)  He first visited the scene in person on September 17, 2014, after he had written his report, and one year after he had arrived at his conclusions.  (Tr. 403, 463-64.)

The court finds FitzPatrick's conclusions to be of questionable reliability, leading the court to credit Dr. Kaplan's opinions over those of FitzPatrick to the extent that they diverge.  In large part, this is because FitzPatrick demonstrated that several of his opinions were based on speculation, not data.

First, FitzPatrick recognized that the traffic signal operations, including the timing of the pedestrian lights, were "the crux of the whole issue." (Tr. 404.) However, as demonstrated on cross-examination, FitzPatrick was under the assumption that the pedestrian and traffic lights were timed to turn to solid red simultaneously. But this assumption was incorrect: The traffic light for Clinton Avenue would have instead turned to yellow at the time the Clinton Avenue pedestrian light turned to solid red. (Tr. 439-41; 449-61.)

Second, he forcefully contended that Dr. Kaplan's Vespa acceleration figures were incorrect, leading Dr. Kaplan's timing calculations to be correspondingly inaccurate. Specifically, FitzPatrick testified that he did not believe the results of Dr. Kaplan's Vespa testing could be accurate because the resulting rates were faster than the average, normal acceleration rate for a passenger vehicle. (Tr. 435-36.) However, FitzPatrick admitted that he did not locate any research regarding Vespa acceleration rates (Tr. 436), and although he could have done so, he did not conduct his own acceleration testing. (Tr. 476-77.) He also suggested that Dr. Kaplan's results would have been problematic with respect to the friction of the roadway, but he did not explain this in any meaningful way. (See Tr. 436-37, 478.) Ultimately, when pressed, FitzPatrick's conclusion here seemed to amount to no more than his "feeling."[20] (Tr. 477-78.)

Third, FitzPatrick's calculations assumed a walking speed for eyewitness Camila Crazut and her children that was based in speculation, and that was inconsistent with an estimate derived from a study published in an authoritative, peer-reviewed publication. (Tr. 418-20, 483-90.)

Fourth, as noted above, FitzPatrick visited the site only after drafting his expert report and arriving at his conclusions. Even at this point he did not take his own measurements.

---

[20] Additionally, FitzPatrick did not understand the basis for Dr. Kaplan's decision to conduct the Vespa acceleration testing over a distance of 60 feet. (Tr. 476-77.) FitzPatrick's lack of understanding of this relatively simple concept is an additional reason for the court to question his conclusions.

(Tr. 465.)  He did not independently calculate the point of impact; however, he argued that Dr. Kaplan's calculated point of impact was off by 10 feet.  (Tr. 464-65.)  He came to this conclusion by assuming that the point of impact noted in the police reports was correct; he did nothing to verify that the police measurements were accurate and that Dr. Kaplan's were not. (Id.)

Fifth, FitzPatrick illustrated his lack of familiarity with the intersection at issue throughout his testimony.  For example, he incorrectly believed that the pedestrian signal indicating "walk" at the intersection was a green person (e.g., Tr. 407, 454), while it is in fact a white person.  (Pl.'s Ex. G at 272; Tr. 189.)

For all of these reasons, the court finds Mr. FitzPatrick's testimony of dubious reliability and instead relies upon Dr. Kaplan's testimony to assist in interpreting the testimony of the following eyewitnesses.

### 2.  Agent Murphy's Testimony

Agent Murphy was driving at between 25 and 30 miles per hour as he approached and entered the intersection.  (Tr. 24.)  He testified that he had a specific recollection of checking the SUV's speedometer as he approached the intersection.[21]  (Tr. 25.)  He was looking forward as he proceeded north on Clinton Avenue.  (Tr. 26.)

Agent Murphy testified that he first noticed the Clinton Avenue traffic light when he was approximately 50-70 yards from the intersection, and the light was green at that time.[22]  (Tr. 23,

---

[21] Plaintiff's counsel tried to suggest that Murphy's testimony to this effect was incredible.  However, Plaintiff did not appear to dispute the 30 mile per hour speed; no evidence was entered to suggest that Murphy was driving at a faster speed, and both parties' experts used a 30 mile per hour speed for their calculations.  (Tr. 281, 415, 420, 469-70, 474.)  Indeed, Murphy's prior statements were consistent regarding this speed.  (Tr. 81.)

[22] Plaintiff's counsel tried to impeach Murphy as to this testimony, noting that Murphy had initially stated at his deposition that he did not know how far back he was from the intersection when he first saw the traffic light. (Tr. 30-31.)  But upon further questioning by Plaintiff's counsel, only 3 pages further into his deposition testimony, Murphy explained that he did not know how long the blocks were, but he was "halfway down the block," and he

29, 32, 45-46, 49-50.)  The next thing Murphy recalled was seeing the light change from green to yellow as he approached the intersection of Clinton and DeKalb.  (Tr. 23.)  Specifically, Murphy stated that the light turned from green to yellow as he entered the intersection.  (Tr. 49-50.)  Nothing was obstructing Murphy's view of the intersection.  (Tr. 41.)

Murphy did not slow down as he entered the intersection;[23] he did not blow his horn.  (Tr. 41; see also Tr. 195.)  Murphy testified that as he proceeded through the intersection, he "saw a flash of movement" to his right, slammed on his brakes,[24] veered to the left, and there was a collision.  (Tr. 23-24; see also Tr. 33.)  The collision occurred "near simultaneously" with that flash of movement.  (Tr. 43.)  Murphy did not see anything, even in his peripheral vision, until that flash.  (Tr. 26.)   He did not know whether he had collided with the object coming from his right, or whether that object had collided with him.  (Tr. 24, 43.)

If Murphy's testimony accurately describes what occurred, then the Clinton Avenue traffic light for Murphy's SUV turned to yellow as the SUV was between the stop line and the beginning of the intersection.  Accordingly, the traffic light for the SUV would have been yellow upon Murphy entering the intersection; and the traffic light for the Vespa would have been red upon McKay-Dalton both beginning to move and entering the intersection.  (Tr. 279, 282, 413.)

---

approximated this to be 50-70 yards away.  (Tr. 45-46.)  This seems entirely reasonable, especially as it was in response to a question by Plaintiff's counsel, not by the Government.

[23] It is undisputed that Murphy did not slow down.  It is disputed whether Murphy increased his speed.  Murphy testified that he did not change his speed at all.  (Tr. 41.)  The only eyewitness who suggested that Murphy may have sped up was Kester Stephens, who testified that he heard a "revving" sound as Murphy approached the intersection; however, the court is hesitant to credit this testimony as Plaintiff's counsel was impermissibly leading this witness.  (Tr. 202-03.)

[24] There is some question as to whether or when Murphy applied his brakes.  Camila Crazut testified that she did not hear any tires squealing prior to impact.  (Tr. 195.)  Similarly, the police report indicated that no skid marks were located at the scene.  (Pl.'s Ex. I at 454.)  However, as Murphy himself testified that he stepped on the brakes and veered to the left near simultaneously with the collision (Tr. 23-24, 33, 43), these are not necessarily inconsistent.

Dr. Kaplan referred to this scenario as Scenario A, and illustrated the scenario with a demonstrative computer animation entered into evidence as Defendant's Exhibit X.[25]

Dr. Kaplan also created a test scenario, which he referred to as Scenario B, illustrating what would have occurred if the traffic light had changed to yellow immediately after Murphy, at the distance of 50-70 yards from the intersection, noticed the green traffic light.[26] (Tr. 279-80; see also Tr. 414.) Under Scenario B, with the SUV traveling at a speed of 30 miles per hour, the traffic light for Murphy's SUV still would have been yellow upon entering the intersection, and the traffic light for McKay-Dalton's Vespa would have been red upon entering the intersection.[27]

Agent Murphy appeared to be a credible witness—he did not seem evasive or defensive on the witness stand. However, the court recognizes that Agent Murphy is an interested party who provided self-serving testimony, and takes this into consideration when ultimately determining the facts of this case.

3. Kester Stephens's Testimony

Kester Stephens was a pedestrian in the vicinity of the intersection at the time of the accident. Specifically, he was on the west sidewalk of Clinton Avenue, north of DeKalb Avenue, walking from north to south toward the intersection. (Tr. 206-07.) When Stephens

---

[25] Specifically, the animation shows the Vespa beginning to move on DeKalb Avenue while the Clinton Avenue traffic light is green and the Clinton Avenue pedestrian light is blinking red. Approximately 2.4 seconds later, the SUV is at the stop line to the south of the intersection and the Vespa has proceeded to the middle of the east crosswalk, just as the traffic light on Clinton Avenue turns to yellow and the Clinton Avenue pedestrian light turns to solid red. One second later, the collision occurs, with no change to the signal colors. Two seconds after impact, the traffic light on Clinton Avenue turns to red. Four seconds after impact, the traffic light on DeKalb Avenue turns to green, and the pedestrian light on DeKalb turns to white. (See Def.'s Ex. X.)

[26] 50-70 yards is the equivalent of 150-210 feet.

[27] If the court were to credit FitzPatrick's view that the Vespa could not have accelerated as quickly as included in Dr. Kaplan's calculations (see Tr. 481-82 (stating that it could have taken longer, not shorter, for McKay-Dalton to reach the point of impact)), she would have had to begin moving even earlier on the red light. Thus, the colors of the traffic lights (yellow for Murphy and red for McKay-Dalton) in both Scenario A and Scenario B would remain the same using FitzPatrick's Vespa acceleration assumptions.

arrived at the northwest corner of DeKalb and Clinton, preparing to cross south over DeKalb, the Clinton Avenue pedestrian signal was a blinking red hand. (Tr. 201, 213-14.) Because he had an ankle fracture, he was unable to walk quickly, so he stopped at the corner and did not cross the street. (Tr. 201, 213.)

After Stephens stopped at the corner, he heard a vehicle proceeding from south to north on Clinton Avenue, towards him. He may have heard the engine, or exhaust.[28] (Tr. 202.) He turned toward the direction of the sound and saw Murphy's SUV. At that time, the SUV was not yet in the intersection; it was still traveling north on Clinton toward the intersection. (Tr. 202, 208-09.) When Stephens saw the SUV, it was either 10-15 feet from the intersection (Tr. 214 (trial testimony)) or 20-30 meters (66-98 feet) from the intersection (Tr. 215 (deposition testimony)).[29]

At just about the same time Stephens saw the SUV, he noticed the Clinton Avenue pedestrian light turn from a blinking red hand to a solid red hand. (Tr. 201, 217-18.) At the time the pedestrian light turned to a solid red hand, the traffic light on Clinton would have turned to yellow.[30] See supra Part I.C. (See also Tr. 277; Def.'s Ex. V; Def.'s Ex. Y.)

At some point while Stephens was stopped on the corner, he also saw the Vespa stopped on DeKalb, at Clinton Avenue. Thereafter, Stephens saw the Vespa move. (Tr. 210-11.) He was unsure how much time elapsed between the moment he first noticed the Vespa and the collision.[31] (Tr. 210.)

---

[28] The court is hesitant to credit Stephens's testimony that he heard a "revving" sound, as Plaintiff's counsel was leading the witness. (Tr. 202-03.)

[29] When asked, Stephens was not sure of the equivalent of 20-30 meters in feet. (Tr. 215.)

[30] Stephens never actually looked at the vehicular traffic lights, only the pedestrian light. (Tr. 209.)

[31] When pressed, Stephens testified that "maybe five seconds" elapsed between when he first saw the Vespa and when it began to move. (Tr. 211.) The court finds that this statement was merely a guess or speculation, as this

Dr. Kaplan created a scenario, labeled Scenario C, that corresponds to Kester Stephens's testimony that he saw Agent Murphy's SUV approximately 20-30 meters from the intersection (as he testifed at his deposition)[32] and that at the same time he saw the SUV the Clinton Avenue pedestrian light turned from a blinking red hand to a solid red hand (and accordingly, at the time the Clinton Avenue traffic light turned from green to yellow).  (Tr. 280, 287.)  Dr. Kaplan illustrated Scenario C via a demonstrative animation, entered into evidence as Defendant's Exhibit F.  The animation illustrates that under this set of circumstances, the Clinton Avenue traffic light would have been yellow at the time Murphy entered the intersection (and remained yellow for approximately half a second after the point of impact).  (Tr. 282 (Kaplan), 474-76 (FitzPatrick); see Def's Ex. F.)  Under this scenario, McKay-Dalton's Vespa would have begun to move and then entered the intersection on a red traffic light.[33]  (Tr. 282 (Kaplan), 474-76 (FitzPatrick); see Def.'s Ex. F.)

As previously noted, Kester Stephens testified at trial that when he saw the SUV it was approximately 10-15 feet from the intersection (rather than 20-30 meters), and that the pedestrian light turned to red just as he turned to see the SUV.  As Dr. Kaplan testified, this account corresponds very closely with Murphy's testimony and Scenario A (that the SUV entered the

_____

timing, combined with the experts' estimates of Vespa acceleration time, would mean that a substantial amount of time had passed between Stephens's arrival on the corner and the collision itself, a conclusion which is inconsistent with Stephens's other testimony.

[32] Specifically, the scenario and its accompanying demonstrative animation adopt the middle of Stephens's 20-30 meter range, i.e., 25 meters.  (Tr. 309.)

[33] The animation shows the Vespa beginning to move on DeKalb Avenue while the Clinton Avenue traffic light is still green, and the Clinton Avenue pedestrian light is blinking red.  One second later, the Vespa has just begun to proceed forward, and the Clinton Avenue traffic light turns to yellow; the Clinton Avenue pedestrian light turns to red.  At this point, the SUV is approximately 60 feet from the south stop line and 75 feet from the middle of the south crosswalk (23 meters from the middle of the crosswalk).  The animation then shows the Vespa arriving in the middle of the east crosswalk approximately 1.3 seconds after the Clinton Avenue traffic light has turned to yellow and the pedestrian light to solid red.  The vehicles collide.  Approximately 0.6 seconds after the impact, the Clinton Avenue traffic light turns to red; at 2.6 seconds after the impact, the traffic light on DeKalb Avenue turns to green, and the DeKalb pedestrian light turns to white.  (See Def.'s Ex. F.)

intersection upon the Clinton Avenue traffic light turning from green to yellow). (Tr. 287.) If the SUV was 10-15 feet from the intersection when the Clinton Avenue traffic light turned to yellow, placing the location and timing of the vehicles somewhere between Scenarios A and C (though closer to A), the traffic light for Clinton would have been yellow at the time Murphy entered the intersection, and the traffic light for DeKalb would have been red at the time McKay-Dalton entered the intersection.[34] (Tr. 474 (FitzPatrick).)

Notably, Stephens's testimony is inconsistent with McKay-Dalton's having waited for a green light to begin accelerating, even with his somewhat imprecise estimates of the SUV's distance. (Tr. 291.) Dr. Kaplan demonstrated that if McKay-Dalton had waited for the green light before proceeding into the intersection, Murphy, traveling 30 miles per hour, would have had to have been at least 302-355 feet away from the intersection at the time he received the yellow light.[35] (See Tr. 290-91.) This distance is significantly at odds with Stephens's testimony, estimating that Murphy was 10-15 feet or 20-30 meters from the intersection when Stephens saw the SUV just as the pedestrian light turned to solid red. Moreover, if McKay-Dalton had waited for the traffic light to turn green, even if the pedestrian light had turned to solid red a second before Stephens turned to look at the SUV, such that the SUV had traveled forward from 302-355 feet by the time Stephens noticed it, the SUV still would have to have

---

[34] Dr. Kaplan also testified that Kester Stephens's prior testimony placing the SUV at 20-30 meters from the intersection at the time he saw it is also consistent with Scenario A (as well as Scenario C), because if the pedestrian light were still blinking when he saw the SUV, the SUV would have moved forward from 20-30 meters by the time the pedestrian light turned to solid red and the traffic light turned to yellow. (Tr. 286-87.) However, the court credits Stephens's trial testimony that the pedestrian light turned to a solid red hand just as he saw the SUV.

[35] Given the traffic signal timing (with 5 seconds elapsing between the Clinton Avenue light turning yellow and the DeKalb Avenue traffic light turning green) and the time it would have taken McKay-Dalton to accelerate and enter the intersection once the light did turn green (between 2 to 3.5 seconds (Tr. 481)), the accident would have had to occur between 7 and 8.5 seconds after Murphy first received a yellow light if McKay-Dalton had waited for the green.

been at least 258-311 feet away from the intersection when Stephens noticed it.  This is because traveling at 30 miles per hour, the SUV would have covered 44 feet in that second.  (Tr. 295.)

4.    Camila Crazut's Testimony

Camila Crazut was walking near the intersection at the time of the collision with her two children, who were 2 and 4 years old.  (Tr. 183; Pl.'s Ex. I at 360.)  The younger child was in a stroller, being pushed by Crazut; the older child was on a scooter.  (Tr. 183-84.)

They were walking on the south sidewalk of DeKalb Avenue, east of Clinton Avenue, moving west toward the intersection.  When they arrived at the southeast intersection of Clinton and DeKalb, the pedestrian light to cross over Clinton was a solid red hand, so they did not cross over Clinton.  (Tr. 187-88.)  Instead, they turned right and crossed north over DeKalb Avenue, crossing from the southeast corner to the northeast corner of the intersection, in the crosswalk. (Tr. 188.)  Before crossing from south to north, Crazut looked at the Clinton Avenue pedestrian light for crossing over DeKalb Avenue.  It was a white person.  (Tr. 189.)

Crazut and her children crossed over DeKalb Avenue with no interference by vehicles in the crosswalk.  (Tr. 189.)  Crazut was holding the stroller with both hands, so she was not holding the hand of the 4-year-old on the scooter.  (Tr. 190.)  They did not rush; they "just walked" across the street at an ordinary pace.  (Tr. 190.)  Crazut was having a conversation with her older child as they crossed the street.  (Tr. 190.)

When they arrived on the northeast corner of the intersection, Crazut turned the stroller to the left, preparing next to cross west over Clinton Avenue.  (Tr. 190-92, 194.)  She may have waited for a moment or so, waiting for the pedestrian light to change.  (Pl.'s Ex. I at 360.)  At one point, Crazut prepared to cross the street, but she was stopped by the sound of a man's scream.  The man was located on the northwest side of Clinton Avenue.  Crazut looked up, and

saw the collision occur in front of her. (Tr. 190-92, 194.) Crazut did not remember if she had actually seen the pedestrian signal turn from a solid red hand to a white person before she was stopped by the scream. (Tr. 191, 196-97.)

Dr. Kaplan testified that Crazut's testimony that the Clinton Avenue pedestrian light was white when she began to cross over DeKalb Avenue was consistent with both Scenario A (Murphy entering the intersection as the Clinton Avenue traffic light turned to yellow) and Scenario C (Murphy receiving the yellow traffic light at a distance of 20-30 meters from the intersection). (Tr. 285, 287-88, 315.)

Dr. Kaplan determined that it was consistent with Scenario A by working backwards. Specifically, he calculated how long it would have taken Crazut to cross over DeKalb Avenue, and took into account some apparent prior testimony that she had been on the corner for five seconds prior to the collision (see Tr. 288, 294); took the assumptions of Scenario A; and looked to see in what phase the pedestrian light would have been at the time she began to cross the street. (Tr. 287-88.) He found that it would have been white. (Tr. 288.)

Dr. Kaplan also explained that given Crazut's testimony, which did not specify at which point during the white pedestrian light she began to walk (see Tr. 293-94, 419), the light could have turned yellow earlier than under Scenario A—i.e., in accordance with the timing of Scenario C, or even sooner. (Tr. 292-94, 315; Def.'s Ex. W.) However, irrespective of the point at which she began to cross during the 7-second white pedestrian light, Dr. Kaplan's calculations indicate that Murphy would have entered the intersection on a yellow light. (See Tr. 292-94; Def.'s Ex. W.)

Plaintiff's rebuttal expert disagreed with Dr. Kaplan and contended that Crazut's testimony was inconsistent with Scenario A. (Tr. 418.) Specifically, FitzPatrick posited that

Scenario A would have resulted in Crazut still being in the crosswalk and in front of McKay-Dalton as she moved her Vespa forward toward the intersection. However, the court does not find this conclusion reliable, as FitzPatrick based this opinion on a speculative 2-feet-per-second walking speed for Crazut and her children, one that is contradicted by a peer-reviewed study published in a reliable publication.[36] (Tr. 418-19, 484-87.)

FitzPatrick assumed that with children, the average walking speed of an adult (4 feet per second) would be cut "at least in half." (Tr. 418-19.) Taking that walking speed, he calculated that Crazut would have been only two-thirds of the way across Clinton Avenue at the time McKay-Dalton had to have begun moving, using Dr. Kaplan's Vespa acceleration timing. (Tr. 419-20.) But FitzPatrick's only basis for assuming that an adult with children would walk at half the ordinary speed was his personal experience or view, not any data or expert knowledge. (Tr. 484, 487-88.) In contrast, a peer-reviewed study from a publication that FitzPatrick viewed to be a reliable authority in the accident reconstruction field found that the mean walking speed of a child with an adult (specifically, a child hand-assisted by an adult) was 3.99 feet per second. (Tr. 484-86.) The study also indicated that the lowest percentile of mean walking speed for this category was 3.36 feet per second. (Tr. 487.) Using these more reliable numbers (3.99 feet and 3.36 feet per second) instead of the 2-feet-per-second figure,[37] FitzPatrick admitted that Crazut and her children would have arrived on the north side of the intersection before the pedestrian light on Clinton Avenue turned to solid red and the traffic light turned to yellow, no matter what time they began walking during the 7 seconds of white. (Tr. 486, 488-90.) Notably, even if they

---

[36] Although this is unclear, FitzPatrick also may have based this opinion on his speculation regarding Vespa acceleration speeds (Tr. 420), and possibly, an incorrect assumption about the interaction of the traffic lights and pedestrian signals. (Tr. 439-41; 449-61.)

[37] The court notes that if it were to credit personal anecdote over the numbers presented in the study, it would find from its own personal experience that children, especially 4-year-olds on scooters, frequently walk or run faster than their adult parents and guardians.

were to have stepped off the corner at the 6.9 second mark, at a pace of 3.36 feet per second they would have arrived at 18.9 seconds, just before the 19 second mark and the point at which the Clinton Avenue traffic light would have turned to yellow. (Tr. 488-90.) If they had begun to move at the start of the white pedestrian signal, and were proceeding at a speed of 3.99 feet per second, they would have arrived with significant time to spare before the same light turned to yellow. (Tr. 486 (at 3.99 feet per second, they would cross in approximately 10 seconds).)

Accordingly, the court credits Dr. Kaplan's conclusion that Camila Crazut's testimony is consistent with both Scenario A and Scenario C—and more generally, with Agent Murphy's having entered the intersection on a yellow light, and McKay-Dalton's having entered the same against a red light.

### 5. M.H. Lorraine Dawodu's Testimony

M.H. Lorraine Dawodu is the only witness who testified that she actually saw McKay-Dalton enter the intersection on a green light and/or Murphy enter the intersection on a red light. (Tr. 146-47.) The court does not credit, and instead discounts in its entirety, the testimony provided by Ms. Dawodu, for the reasons stated on the record and those described below.

First, on the day of the accident, Dawodu was extremely emotional. She had a summer school final exam scheduled for later that day. She had been running errands, including checking on her financial aid. (Tr. 146, 149-50.) She was upset, having learned that there was a problem with her financial aid check. As she put it, she was "perturbed and livid," "trying to calm down after they stole four grand." (Tr. 152, 156.) She was considering not taking her final exam, thinking that it might then be rescheduled so that she could take it another day. (Tr. 153.) Ultimately, she did not take her final exam that day. (Tr. 168.)

Second, Dawodu's testimony was unbelievable on its own merit, and inconsistent with other eyewitness testimony and her own prior testimony. She testified that she obesrved the accident while her car was parked on the north side of DeKalb Avenue, close to the intersection and to McKay-Dalton's Vespa. (Tr. 152-56.) The car was unlocked but she stood outside the car, on the driver's side, and leaned on either the hood or the roof of the car. (Tr. 152-56.) She incredibly suggested that she had been able to see everything, everywhere, all at once, including McKay-Dalton, who, according to Dawodu's testimony, would have been located behind Dawodu. (Tr. 157, 158, 162.)

Dawodu also testified that from her location, she could see the traffic lights for cars that were traveling west on DeKalb Avenue and the traffic lights for cars traveling north on Clinton Avenue. (Tr. 160-61.) But as court observed for itself, it would not have been possible for Dawodu to see the color of the Clinton Avenue traffic lights from where she was situated, on a sunny summer day, and looking toward the southwest at 5:25 p.m., into the sun. See supra Part I.A. (See also Tr. 291-92.)

Incredibly, Dawodu incorrectly (and with great apparent certainty) identified as her car on the date of the accident a car in a photograph actually taken two years after that date. (See Tr. 157-59, 243, 252; Def.'s Ex. T.)

Dawodu further stated (again, with great apparent conviction) that Murphy proceeded into the intersection several minutes after the traffic light on Clinton had turned red. (Tr. 280-81.) As the traffic lights run on a 60-second cycle, this is impossible. And even if Dawodu were simply exaggering, this would still call into question the reliability of her statements. Moreover, Dr. Kaplan credibly explained why an account that Murphy ran a red light by any large interval of time is inconsistent with the other eyewitness accounts. (Tr. 280-81.)

Dawodu also testified that she saw McKay-Dalton stopped on DeKalb Avenue prior to the accident and that McKay-Dalton was in the bike lane, which is on the south side of the street. (Tr. 157, 159; Def.'s Ex. F.)  This is inconsistent with the other eyewitness accounts.  (E.g., Tr. 215-16 (Stephens); Tr. 131-33 (Elesh).)

Dawodu testified at trial that she had been wearing her glasses at the time of the accident. (Tr. 169.)  At her deposition, she stated that her glasses were in the car.  (Tr. 169-70.)

Third, Dawodu's behavior generally was irrational and raised serious issues regarding her credibility.  She was over 2 hours late to court.  (Tr. 139.)  When she did appear, she was unfocused.  Many of her answers were incoherent.  She did not seem to understand and/or she did not listen when the court explained that she should not consult any personal notes she had previously taken in order to answer questions posed.  (Tr. 144-45.)  After only a few minutes of testimony she asked to go to the restroom and left the courtroom; the court was concerned she might not make it back and directed Plaintiff's counsel to wait for her in the hall.  (Tr. 150-51.) She stated on the witness stand that she had not spoken to Plaintiff's attorneys since her deposition (Tr. 149), although this was untrue.  (Tr. 243.)  And perhaps most tellingly, immediately upon leaving the witness stand, she looked for McKay-Dalton's husband, displaying bias, or at least sympathy, for the Plaintiff.  (Tr. 171.)  Similarly, at the beginning of cross-examination, when counsel for the Government stated that he represented the SUV driver, Dawodu exclaimed, "You're not the good guy.  You're not the good guy."  (Tr. 148.)

Ultimately, the court believes that Dawodu feels bad for McKay-Dalton and Plaintiff, and that she is trying to help the Plaintiff out of sympathy.  To some extent, this is understandable, but given the utter lack of reliability she demonstrated, the court cannot and will not credit any of her testimony.

6.    <u>Conclusion</u>

In sum, the court does not give any credence to M.H. Lorraine Dawodu's testimony. The other eyewitness testimony (that of Agent Murphy, Kester Stephens, and Camila Crazut) is all consistent with Agent Murphy having entered the intersection on a yellow traffic light, and McKay-Dalton having entered the intersection against a red traffic light.

More specifically, Camila Crazut's testimony does little to limit the location of Agent Murphy's SUV during the yellow light, so the court looks to Agent Murphy and Kester Stephens's testimony for that purpose. Agent Murphy testified that the light turned yellow as he entered the intersection. Kester Stephens testified that the pedestrian light turned red (corresponding with the traffic light turning to yellow) when Agent Murphy was either 10-15 feet or 20-30 meters from the intersection. Neither of these estimates is wholly reliable, as Murphy's testimony is at least somewhat self-serving, Stephens's testimony changed from deposition to trial, and Stephens was unable to state the equivalent of 20-30 meters in feet.

As it does not affect the court's Conclusions of Law, the court therefore finds only that (1) the traffic light on Clinton Avenue turned from green to yellow when Murphy's SUV was somewhere between 20-30 meters from the intersection and the intersection stop line; (2) the Clinton Avenue traffic light was yellow at the time Murphy entered the intersection and at the point of impact; (3) the DeKalb Avenue traffic light was red at the time McKay-Dalton entered the intersection and at the point of impact; and (4) the accident would not have occurred if McKay-Dalton had waited for the DeKalb Avenue traffic light to turn to green before proceeding into the intersection, because the SUV would have been out of the intersection by that time. (Tr. 294-95, 466-67, 470-71, 483.)

A good deal of Plaintiff's expert's testimony, and Plaintiff's closing argument, focused on what Mr. FitzPatrick termed "human factors."  (E.g., Tr. 444-46, 466-68, 506.)  Dr. Kaplan did not take these into consideration in developing his reconstruction.  (Tr. 317.)  The crux of Plaintiff's and FitzPatrick's argument here is that Murphy must not have had the right-of-way because there is no conceivable reason why McKay-Dalton would have entered the intersection on a red light, after being stopped at that light for a period of time.  (See, e.g., Tr. 506.)  However, there are several conceivable, even plausible reasons that could have resulted in McKay-Dalton entering the intersection against a red light.  Among others, it is possible that she was watching the pedestrian lights rather than the traffic lights.  Under Scenario C, for example, the Vespa would have just begun to proceed forward as the Clinton Avenue pedestrian light turned to red, and would have arrived in the middle of the crosswalk approximately 1.3 seconds after the Clinton Avenue traffic light had turned to yellow and the pedestrian light to solid red.  See supra note 33.  (See also Def.'s Ex. F.)  It is also possible that she was distracted by something on her iPhone, including but not limited to one of the various activities that a forensic examination of the phone may have revealed but that was not evidenced by the cellphone records—for example, sending and/or receiving an iMessage, or composing an unsent text message.  See supra Part I.E.4.  In sum, Plaintiff's arguments to this effect do not change the court's conclusion, based on the credible eyewitness testimony, that Agent Murphy entered the intersection on yellow, and that McKay-Dalton did so on red.

### G.      Ability to Stop

Plaintiff attempted to introduce evidence to show that at the time Murphy received a yellow light, he would have been able to stop prior to entering the intersection.  Plaintiff asked Dr. Kaplan on cross-examination whether Murphy would have been able to stop if he had

received the yellow light at 25 meters from the intersection. (Tr. 310-11.) However, Dr. Kaplan was not offered for any opinions regarding Murphy's ability to stop (Tr. 311-12), and he did not have those calculations with him at trial. (Tr. 311.) He testified that there were some distances where it is possible to stop and some where it is not possible. (Tr. 312.) Using the Plaintiff's hypothetical perception/reaction time of half a second, Dr. Kaplan testified that he believed the SUV would have been able to stop and avoid the accident from 25 meters away, although he could not say for certain without performing the calculations. (Tr. 310-11.)

FitzPatrick testified on rebuttal regarding his opinions on Murphy's ability to stop from various distances. (Tr. 421, 424-45, 429-30.) Specifically, he opined that Murphy, being a young driver in good health, could have stopped from a distance of 63 feet (approximately 20 meters) given dry conditions. (Tr. 429-30.) The Government objected to this line of questioning, as Dr. Kaplan had not opined on this topic other than on cross-examination. (Tr. 424.) The court permitted the testimony with the caveat that it would decide later whether the testimony was relevant. (Tr. 242-25.) The court now finds that Mr. FitzPatrick's testimony was not relevant as a rebuttal to Dr. Kaplan's offered opinions.

Given the foregoing, the court finds that Plaintiff has not proven by a preponderance of the properly introduced evidence that Murphy could have stopped and avoided the accident from the range within which the court has concluded he first received a yellow light (somewhere between 20-30 meters from the intersection and the stop line), see supra Part I.F.6. Regardless, this does not affect the court's Conclusions of Law. As explained below, even if Plaintiff had proven that Murphy could have slowed down and come to a stop upon receiving the yellow light, this would not establish liability under relevant law.

## II.    CONCLUSIONS OF LAW

### A.    Legal Standard

Under the FTCA, a person may bring a claim against the United States for personal injuries "caused by the negligence or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  The Government's liability is determined based on the "law of the place where the act or omission occurred," which in this case is New York State.  Id.  Under New York law, Plaintiff must establish: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom."  Wright v. United States, No. 09-CV-5411 (NGG), 2012 WL 3249694, at *4 (E.D.N.Y. Aug. 7, 2012) (quoting Solomon v. City of New York, 489 N.E.2d 1294, 1294 (N.Y. 1985)) (internal quotation marks omitted).  Plaintiff bears the burden of proving these elements by a preponderance of the evidence.  Vaselli v. United States, No. 12-CV-6221 (JFB), 2014 WL 4961421, at *4 (E.D.N.Y. Oct. 3, 2014); Kane v. United States, 189 F. Supp. 2d 40, 52 (S.D.N.Y. 2002).

### B.    Discussion

A violation of a standard of care imposed by the New York State Vehicle and Traffic Law constitutes negligence per se.  E.g., Barbieri v. Vokoun, 900 N.Y.S.2d 315, 318 (App. Div. 2010).  Plaintiff raises three theories of Murphy's alleged breach of a duty of care: (1) Murphy's failure to stop at a steady red light, in violation of New York State Vehicle and Traffic Law § 1111(d)(1); (2) Murphy's failure to drive at a reduced speed when approaching and crossing the intersection, in violation of New York State Vehicle and Traffic Law § 1180(e); and (3) Murphy's breach of the common law duty to "see that which he should have seen through the proper use of his senses," Botero v. Erraez, 734 N.Y.S.2d 565, 566 (App. Div. 2001).

The Government argues that McKay-Dalton herself breached a duty of care, and that her breach was the sole proximate cause of the accident. The Government contends that McKay-Dalton's negligence consisted of: (1) her failure to remain standing at a steady red light, in violation of New York State Vehicle and Traffic Law § 1111(d)(1); and (2) her failure to yield the right-of-way to Murphy's SUV, in violation of New York State Vehicle and Traffic Law § 1140(a).

1.    New York State Vehicle and Traffic Law § 1111(d)(1)

Section 1111(d)(1) of the Vehicle and Traffic Law mandates that a vehicle "facing a steady circular red signal . . . shall stop at a clearly marked stop line, but if none, then shall stop before entering the crosswalk . . . and shall remain standing until an indication to proceed is shown . . . ." N.Y. Veh. & Traf. Law § 1111(d)(1). As stated in the court's Findings of Fact, the preponderance of credible evidence introduced at trial did not establish that Murphy entered the intersection on a red light; rather, it established that Murphy entered the intersection upon a yellow light. See supra Part I.F.6. Accordingly, Murphy did not breach the duty of care created by section 1111(d)(1). The evidence also established that, after remaining stationary at the intersection for some period of time at a steady red light, McKay-Dalton began to move and entered the intersection while her light remained red. Accordingly, McKay-Dalton did breach the section 1111(d)(1) duty of care.[38] As the accident would not have occurred had she waited for the light to turn green, see supra Part I.F.6, the court concludes that this negligence was the proximate cause of her death.

---

[38] Because the court has determined that Murphy's traffic light was yellow and McKay-Dalton's was red at the time she entered the intersection, McKay-Dalton also breached the duty of care imposed by section 1140(a) of the Vehicle and Traffic Law, requiring the "driver of a vehicle approaching an intersection [to] yield the right of way to a vehicle which has entered the intersection from a different highway." N.Y. Veh. & Traf. Law § 1140(a).

2.      <u>New York State Vehicle and Traffic Law § 1180(e)</u>

New York State Vehicle and Traffic Law § 1180(e) states that "[t]he driver of every vehicle shall, consistent with the requirements of subdivision (a) of this section, drive at an appropriate reduced speed when approaching and crossing an intersection . . . ." N.Y. Veh. & Traf. Law § 1180(e).  Subdivision (a) provides that "[n]o person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing." <u>Id.</u> § 1180(a).  New York State courts have held that section 1180(e) "does not mandate that a driver reduce his or her speed at every intersection, but only when warranted by the conditions presented." <u>E.g.</u>, <u>Mosch v. Hansen</u>, 744 N.Y.S.2d 222, 224 (App. Div. 2002) (internal quotation marks and citations omitted); <u>Bagnato v. Romano</u>, 578 N.Y.S.2d 613, 614 (App. Div. 1992), <u>mot. for leave to appeal denied</u>, 81 N.Y.2d 701.

Whether conditions warrant such a reduction of speed is a question of fact. <u>See</u> <u>Bagnanto</u>, 578 N.Y.S.2d at 614.  However, case law is instructive on that question in several important ways.  Case law affirms that a motorist with the right-of-way, driving at a lawful speed, is not required to slow down pursuant to section 1180(e) unless a particular condition at the intersection warrants that he does so. <u>E.g.</u>, <u>Anastacio v. Scheer</u>, 658 N.Y.S.2d 467, 467-68 (App. Div. 1997); <u>see also</u> <u>Mosch</u>, 744 N.Y.S.2d at 223-24 (same when driving 5 miles per hour over speed limit).  And New York law is clear that a motorist with the right-of-way is entitled to assume that other drivers will obey traffic laws that require them to yield. <u>See</u> <u>Miglionico v. Leroy Holdings Co., Inc.</u>, 909 N.Y.S.2d 829, 830-31 (App. Div. 2010) ("[T]he driver of a vehicle with the right-of-way is entitled to anticipate that other vehicles will obey the traffic laws that require them to yield.  In this regard, a driver has no duty to watch for and avoid a driver who might fail to stop or to proceed with due caution at a stop sign." (internal quotation marks

and citations omitted)); <u>Chietan v. Persaud</u>, 869 N.Y.S.2d 177, 178 (App. Div. 2008) ("[T]he driver with the right of way, was entitled to anticipate that the defendant . . . would obey traffic laws which required him to yield." (internal quotation marks omitted)); <u>Wallace v. Kuhn</u>, 804 N.Y.S.2d 187, 188 (App. Div. 2005) ("In the absence of any condition that would have required him to reduce his speed, [the plaintiff] was entitled to approach the intersection without slowing and was further entitled to anticipate that [the defendant] would obey the traffic laws that required him to yield."); <u>Mosch</u>, 744 N.Y.S.2d at 224 ("As operators of vehicles having the right-of-way, defendants were entitled to expect that other vehicles would obey the traffic laws requiring them to yield."); <u>Barile v. Carroll</u>, 720 N.Y.S.2d 674, 675 (App. Div. 2001) (same).

Thus, section 1180(e) did not require Murphy to reduce his speed. The court has found that Murphy entered the intersection with the right-of-way. The law did not require Murphy to anticipate that McKay-Dalton might advance into the intersection before receiving a green light, and no other circumstances have been established that permit the court to find a reduction of speed was warranted. Murphy was driving at a reasonable speed, within the speed limit. Notably, the day was sunny and clear. <u>See</u> <u>Mosch</u>, 744 N.Y.S.2d at 224 ("The weather conditions were ideal, . . . and we are unpersuaded that the mere presence of vehicles parked or standing on the shoulder of the highway should have alerted defendants to the likelihood that a vehicle would suddenly enter the intersection against a red light."). He did not see McKay-Dalton entering the intersection with sufficient time to slow down and avoid the collision. The fact that Murphy's light was yellow, as opposed to green, does not affect this legal conclusion. <u>See</u> <u>Colaruotolo v. Crowley</u>, 736 N.Y.S.2d 525, 527 (App. Div. 2002) (holding that defendant operating a vehicle entering an intersection controlled by flashing yellow signal was not required to stop prior to the collision because defendant "had the right-of-way and was entitled to

anticipate that drivers whose progress is regulated by a stop sign and a flashing red light would comply with the Vehicle and Traffic Law and yield the right-of-way").

The cases upon which Plaintiff relies (see Pl.'s Proposed Findings of Fact and Conclusions of Law (Dkt. 76) ¶ 71; Pl.'s Post-Trial Mem. of Law (Dkt. 77) at 1-2) do not affect the court's conclusion. Plaintiff relies most heavily upon Silva v. United States, No. 08-CV-4114 (JBW), 2010 WL 3731172 (E.D.N.Y. Sept. 20, 2010), to argue that a yellow light is a sufficient condition requiring a driver to reduce his speed. But the case does not stand for this proposition. In Silva, the plaintiff's vehicle was hit from behind by a hit-and-run driver while it waited at an intersection for an opportunity to turn left, pushing it into the path of the defendant's automobile; then, the plaintiff's vehicle was struck by the defendant, who had sped up upon receiving a yellow light. Id. at *1-2. After a bench trial, Judge Weinstein held the defendant fully liable for all of the plaintiff's damages. Id. at *3. As Plaintiff notes, the Silva defendant did have a yellow light (either a fixed blinking yellow light or a solid yellow light) at the time he struck the plaintiff's vehicle, and Judge Weinstein stated, inter alia, that the defendant had failed to reduce his speed when he approached the intersection. Id. at *1-2. However, Judge Weinstein mentioned section 1180(e) only in passing, and that provision did not provide the sole basis for a finding of liability in Silva. Judge Weinstein ultimately found that the defendant was negligent because he was "traveling at a high and dangerous rate of speed on a slick road as he neared the intersection, did not look for or see plaintiff's car in his lane, and sped up to avoid a light then yellow." Id. at *2. Importantly, that defendant had been speeding, and he not only failed to slow down but instead sped up as he approached the intersection.[39] Id. Additionally, though Judge Weinstein did not explicitly discuss section 1180(e) and whether particular circumstances had

---

[39] As explained in the court's Findings of Fact, the court does not credit Kester Stephens's testimony that he heard a "revving" sound as Murphy approached the intersection. See supra notes 23 and 28.

warranted a reduction of speed, such a finding would be entirely consistent with the factual circumstances established (the accident occurred at night, the road was slippery, and the defendant had been traveling at an unsafe speed above the speed limit). See id. at *1-2.[40]

As discussed in the court's Findings of Fact, Plaintiff has not proven by a preponderance of the evidence that Murphy could have slowed down and stopped, avoiding the accident, at the point at which he received the yellow light. See supra Part I.G. However, for the reasons discussed herein, the court also concludes that even if Plaintiff had established as much, Murphy's failure to slow down and stop on the yellow light would not have been a breach of the section 1180(e) duty of care under the circumstances presented at that time.

3.    Common Law

New York law also holds, as a matter of common law, that a driver is negligent "when an accident occurs because he or she failed to see that which through the proper use of his or her senses he or she should have seen." Katanov v. Cnty. of Nassau, 936 N.Y.S.2d 285, 287 (App. Div. 2012); see also Botero v. Erraez, 734 N.Y.S.2d 565, 566 (App. Div. 2001). Murphy testified that he did not see McKay-Dalton until almost immediately before the collision. Plaintiff contends that Murphy's failure to have seen McKay-Dalton earlier constitutes negligence.

---

[40] Plaintiff cites two additional cases in support of his argument, Stinehour v. Kortright, 550 N.Y.S.2d 169 (App. Div. 1990), and Teller v. Anzano, 694 N.Y.S.2d 780 (App. Div. 1999). These are equally inapposite. In Stinehour, the Appellate Division did not invoke or even reference section 1180(e). Rather, the defendant was held liable for (1) having noticed the plaintiff approaching the same intersection, from the opposite direction, and (2) nonetheless, initiating a left turn in front of the plaintiff, (3) at the same time he (the defendant) looked away from the direction from which the plaintiff was coming. Id. at 170. The plaintiff was unable to stop and collided with defendant's vehicle. Id. The court held that the defendant's actions constituted a failure to yield upon a left turn, in violation of section 1141 of the Vehicle and Traffic Law. See id. at 170 (citing N.Y. Veh. & Traf. Law § 1141). Teller involved a collision at an intersection that was not controlled by a traffic signal; moreover, the plaintiff was found to have been partially at fault for having accelerated while changing lanes as he approached the intersection, as well as for having done so while his line of sight was likely obstructed by a truck driving directly in front of him. Id. at 647-48.

The evidence introduced at trial does not cause the court to infer that Murphy should have seen McKay-Dalton in the exercise of reasonable care as he approached the intersection. Plaintiff argues, inter alia, that Murphy "was using a GPS," "did not recall seeing pedestrians on the road or any cars on DeKalb Avenue," and "received a cell phone call . . . very close to the time of the accident." (Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 77.) The court has specifically found that Agent Murphy was not distracted by the phone call he received at 5:24 p.m. <u>See</u> <u>supra</u> Part I.D.3.b (the call was not answered and reached Murphy's voicemail). Additionally, Agent Murphy testified that he was using the voice function of his GPS unit, <u>supra</u> Part I.D.3.a, and that he was looking forward as he drove north on Clinton Avenue toward the intersection, <u>supra</u> Part I.F.2. Plaintiff introduced no evidence at trial to the contrary. Moreover, a failure to recall seeing pedestrians (who, presumably would be on the sidewalk and not forward of Murphy on the road) or cars located on DeKalb Avenue (which, given the red light on DeKalb Avenue, presumably also would be not forward of Murphy on Clinton Avenue) is not inconsistent with this testimony. Further, no evidence was introduced at trial that would allow the court to determine at what point, as he approached the intersection, Murphy would or should have been able to see McKay-Dalton, either in the location where she stood at the intersection or as she began to proceed forward.

Accordingly, the court finds that Murphy did not breach his common law duty to see what he should have seen under the proper use of his senses. <u>See</u> <u>Barile v. Carroll</u>, 720 N.Y.S.2d 674, 675 (App. Div. 2001) (holding that defendant's admitted failure to see the decedent's vehicle until the moment of impact did not defeat motion for summary judgment, due to lack of evidence that such failure was due to any negligence); <u>see also</u> <u>Wallace v. Kuhn</u>, 804 N.Y.S.2d 187, 188 (App. Div. 2005); <u>O'Hara v. Tonner</u>, 732 N.Y.S.2d 147, 149 (App. Div. 2001).

C.     The **Noseworthy** Doctrine

New York State's Noseworthy doctrine allows a factfinder "greater latitude in drawing an inference of negligence" under certain circumstances when a plaintiff is unable to testify.[41] Saint v. United States, 483 F. Supp. 2d 267, 278 (E.D.N.Y. 2007); Horne v. Metro. Transit Auth., 440 N.Y.S.2d 695, 696 (App. Div. 1981) ("[I]n a wrongful death action, where there are often no surviving eyewitnesses to the occurrence which resulted in the death, circumstantial evidence may be afforded a greater degree of weight than in cases where there are eyewitnesses who can testify to the occurrence in question."); see also Noseworthy v. City of New York, 80 N.E.2d 744 (N.Y. 1984). The doctrine does not alter a plaintiff's burden to prove each element of his case by a preponderance of the credible evidence. Kazanoff v. United States, 945 F.2d 32, 35 n.4 (2d Cir. 1991); Saint, 483 F. Supp. 2d at 278; Oginski v. Rosenberg, 495 N.Y.S.2d 699, 700 (App. Div. 1985). Therefore, it "may not be invoked unless plaintiff first makes a showing of facts from which negligence may be inferred," Barile v. Carroll, 720 N.Y.S.2d 674, 675 (App. Div. 2001), and if "competing inferences are equally reasonable, the inference in accord with nonnegligence must be drawn." Oginski, 495 N.Y.S.2d at 700.

The purpose of the Noseworthy doctrine "is to circumvent the situation where a tortfeasor who inflicts personal injury would be insulated from liability simply because . . . the decedent, who would have been in the best position to describe the event from plaintiff's point of view, is unavailable to do so." Kazanoff, 945 F.2d at 35 n.4; see also Oginski, 495 N.Y.S.2d at 700 ("The rationale for the so-called Noseworthy doctrine is that due to the plaintiff's inability to testify, which may have been caused by the defendant, the bulk of the evidence adduced at trial

---

[41] The United States does not dispute Plaintiff's position that the doctrine is available in an FTCA action governed by New York State law. Indeed, several district courts have held that the doctrine is applicable in FTCA cases. E.g., Saint v. United States, 483 F. Supp. 2d 267, 278 (E.D.N.Y. 2007); Shepard v. United States, 811 F. Supp. 98, 101 (E.D.N.Y. 1993). The Second Circuit has not definitively decided this issue. Kazanoff v. United States, 945 F.2d 32, 35 n.4 (2d Cir. 1991).

will be circumstantial.").  Although the paradigmatic application of the doctrine occurs where there are no surviving eyewitnesses, or the defendant—an interested party—is the only testifying eyewitness, see, e.g., Noseworthy, 80 N.E.2d at 745-46; see also Shepard v. United States, 811 F. Supp. 98, 101 (E.D.N.Y. 1993); Horne, 440 N.Y.S.2d at 696, it has at times been applied when the plaintiff has called eyewitnesses to testify.  See Schecter v. Klanfer, 269 N.E.2d 812, 814 (N.Y. 1971); Holiday v. Huntington Hosp., 563 N.Y.S.2d 444, 447 (App. Div. 1990).

The United States argues that in this case, where eyewitnesses did testify to the facts and circumstances of the accident, the only appropriate use of the doctrine is as it bears on the weight to be assigned any circumstantial evidence that McKay-Dalton had a green light at the time she entered the intersection, as this "presumably is what Plaintiff asserts would have been Ms. McKay-Dalton's testimony had she been able to testify at the trial."  (Def.'s Proposed Findings of Fact and Conclusions of Law (Dkt. 78) at 48 (citing Holiday, 563 N.Y.S.2d at 447 ("The charge as given invited the jury, quite properly, to weigh *only such factual testimony as the decedent might have testified to*, had he lived, according to the *Noseworthy* standard." (emphasis in Defendant's brief))).)  Plaintiff does not appear to disagree with this position, and suggests that the doctrine might be limited to the question of McKay-Dalton's comparative negligence. (See Pl.'s Post-Trial Mem. of Law at 4 ("Despite the existence of witnesses, Aileen's unique perspective, the only one which would have told whether or not she saw the danger and sought to avoid it, died with her.").)

Given the parties' positions and the purpose of the doctrine, the court agrees that the Noseworthy doctrine should be limited in this case to permit the court as factfinder to give greater weight to any circumstantial evidence that McKay-Dalton had, or believed she had, a green light at the time she entered the intersection.  However, this use of the doctrine does not

affect the court's previously-stated conclusions, i.e., that McKay-Dalton did in fact enter the intersection upon a solid red traffic signal. Plaintiff did not put forward circumstantial evidence from which it could be inferred that McKay-Dalton had a green light when she entered the intersection.[42] Instead, the circumstantial evidence—the testimony by Kester Stephens and Camila Crazut regarding what they saw and did, and the colors of the pedestrian lights at those times—weighs in favor of a finding that Agent Murphy entered the intersection on a yellow light, and McKay-Dalton did so on a red light.[43] See supra Part I.F.3-4. Therefore, the Noseworthy doctrine does not change the outcome of this case.

## III.   CONCLUSION

This was without question a tragic accident, and the court has a great deal of sympathy for Aileen McKay-Dalton and her family. However, after full consideration of the record, and for the reasons discussed above, the court concludes that Plaintiff did not establish by a preponderance of the evidence that Agent Murphy was negligent. The United States is therefore not liable to Plaintiff under the FTCA. Accordingly, the damages portion of the bench trial that was previously scheduled to begin January 8, 2015, is hereby cancelled. The Clerk of Court is respectfully directed to enter judgment for the United States and close the case.

SO ORDERED.

s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
December 3 , 2014

---

[42] And given the court's Conclusions of Law finding Agent Murphy nonnegligent, any testimony that McKay-Dalton may have provided bearing in any other way on the issue of comparative negligence, had she been able to, is rendered irrelevant.

[43] As the United States correctly notes, M.H. Lorraine Dawodu's testimony that she saw McKay-Dalton enter the intersection upon a green light and Dalton upon a red is direct, not circumstantial testimony. (Def.'s Proposed Findings of Fact and Conclusions of Law at 48.) Moreover, this testimony is not credible.